# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
)
SENIORLINK INCORPORATED,                 )
)
    Plaintiff,                           )
)
v.                                       )
)          Case No. 19-cv-11248-DJC
)
BETH LANDRY,                             )
)
    Defendant.                           )
)
_____           )

## MEMORANDUM AND ORDER

CASPER, J.                                          September 2, 2021

## I.    Introduction

Plaintiff Seniorlink Incorporated ("Seniorlink") filed this lawsuit against Defendant Beth Landry ("Landry") seeking injunctive relief and damages for Landry's alleged breach of both a Confidentiality, Non-Competition, Non-Solicitation, and Inventions Agreement (the "Non-Solicitation Agreement") (Count I) and a Separation Agreement and Release (the "Separation Agreement") (Count II).  D. 1.  Landry asserted counterclaims against Seniorlink for breach of the Non-Solicitation Agreement (Count I), the Separation Agreement (Count II), the Stock Option Agreement (Count III), and its fiduciary duty (Count IV) as well as an intentional interference with employment relationships claim (Count V).  D. 7.  Landry moved for summary judgment on Counts I–III of her counterclaims, D. 112, and seeks voluntarily to dismiss Counts IV and V of her counterclaims.  D. 110.  Seniorlink moved for summary judgment on its claims, and cross-moved for summary judgment on Counts I–III of Landry's counterclaims.  D. 115; D. 118.  The

1

parties have also moved to strike portions of their opponent's summary judgment briefing.  D. 121; D. 129; D. 151.  For the following reasons, the Court ALLOWS Landry's motion to dismiss, D. 110, DENIES Landry's motion for summary judgment, D. 112, DENIES Landry's motion to strike, D. 129, DENIES Seniorlink's motions to strike, D. 121; D. 151, and ALLOWS Seniorlink's motions for summary judgment, D. 115; D. 118.[1]

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are undisputed unless otherwise noted and are drawn from the parties' submissions of material facts, D. 114; D. 117; D. 120, and responses to same.  D. 131; D. 133.

---

[1]In light of these rulings, the Court denies Seniorlink's motion, for leave to file a reply brief, D. 154, as moot.

A.      **Landry's Employment with Seniorlink**

Seniorlink is a healthcare and technology company, incorporated in Delaware and with headquarters in Massachusetts.  D. 114 ¶ 1; D. 120 ¶ 1; D. 131 ¶ 1; D. 133 ¶ 1.  Seniorlink hired Landry as Senior Vice President of Operations, a position which she held from September 2014 until August 2018.  D. 120 ¶ 2; D. 133 ¶ 2; D. 114 ¶ 18; 131 ¶ 18.

Landry signed a written employment agreement with Seniorlink on December 4, 2014 that provided, *inter alia*, for incentives based on performance and the potential for unvested stock option grants, under the Stock Option Agreement.  D. 114 ¶¶ 6–8; D. 131 ¶¶ 6–8.  The Stock Option Agreement, which Landry also signed, incorporated by reference Seniorlink's 2009 Stock Option and Stock Incentive Plan (the "Stock Plan").  D. 114 ¶ 9; D. 131 ¶ 9.  Landry also signed a Non-Solicitation Agreement at the beginning of her employment in 2014, and the operative (revised) Non-Solicitation Agreement in January 2017.  D. 120 at 281, 296.  That Non-Solicitation Agreement states, in relevant part, that:

> [the employee] will not, for a period of one (1) year after termination (for any reason) of his or her employment with the Company, directly or indirectly, either alone or in association with others, hire, or approach, solicit, recruit, induce, entice or attempt to hire, or approach, solicit recruit, induce or entice any of the other employees, contractors, consultants or Business Partners of the Company of its Affiliates, who or which were employed by or provided services to the Company at any time during the term of the Covered Person's employment with the Company, to leave the employment of the Company or to provide services to other Persons; provided, that this restriction shall not apply to any individual or entity who or which has not been employed by or provided services to the Company for at least twelve (12) months.

D. 120 at 277.  Seniorlink "conditioned" eligibility in its Incentive Compensation Plan (i.e., eligibility for discretionary bonuses) "upon the execution" of the 2017 Non-Solicitation Agreement.  Id. at 283, 290.  The Incentive Compensation Plan further stated that "your acceptance

of any payment under this Plan is expressly understood to be a reaffirmation of your obligations under any existing [Non-Solicitation Agreement]." Id.  Landry signed and agreed to Seniorlink's Incentive Compensation Plan.  Id. at 285, 292.  Landry received multiple bonuses from Seniorlink in 2017 and 2018.  D. 120 ¶¶ 11, 13; D. 133 ¶¶ 11, 13.

In August 2018, Seniorlink terminated Landry's employment.  D. 114 ¶ 18; D. 131 ¶ 18. Landry signed a Separation Agreement and Release on September 10, 2018.  D. 120 ¶ 25; D. 133 ¶ 25.  The Separation Agreement provided Landry with severance, COBRA reimbursement, career transition services and an extension for Landry to exercise her vested stock options until March 31, 2019.  D. 120 ¶ 26; D. 133 ¶ 26; D. 134-4 at 73.  Landry further agreed to a release of claims against Seniorlink and a non-disparagement clause.  D. 134-4 at 75.

### B.     Landry's Employment with Caregiver and Alleged Solicitation

Landry sought new employment with Caregiver Inc. ("Caregiver").  D. 114 ¶¶ 22–24; D. 131 ¶¶ 22–24.  Prior to accepting, Landry communicated with Seniorlink to confirm that, pursuant to her Non-Solicitation Agreement, Seniorlink did not oppose her employment there.  Id.  Tom Riley ("Riley"), Seniorlink's CEO, confirmed that Landry was free to pursue the opportunity.  Id. Landry began working for Caregiver in January 2019 as President of Operations for Indiana, Tennessee and Ohio.  D. 120 ¶ 36; D. 133 ¶ 36.

Melanie Morris ("Morris") was employed by Caregiver Homes of Indiana, Inc.,[2] a subsidiary of Seniorlink.  D. 120 ¶ 20; D. 133 ¶ 20; D. 114-8 at 2.  Around December 2018, Morris began looking for a new job.  D. 114 ¶¶ 26–28; D. 131 ¶¶ 26–28.  After Landry's departure from Seniorlink, Landry and Morris stayed in touch and discussed Morris's desire to change jobs.  D.

---

[2] The Court notes that Caregiver, Landry's new employer and Caregiver Homes of Indiana, Inc., a subsidiary of Seniorlink, and Morris's prior employer, are different companies.  D. 120 ¶ 20; D. 134-7 at 2.

120 ¶ 34; D. 133 ¶ 34.  On January 30, 2019, Caregiver posted an opening on Landry's team for the position of Indiana State Director.  D. 120 ¶¶ 38, 40–41; D. 133 ¶¶ 38, 40–41.  Morris applied online for the position that same day.  Id.  The parties dispute the extent to which Landry and Morris communicated prior to Morris's application for the position as well as the extent to which Landry discussed or promoted Morris's application internally at Caregiver.  See D. 133 at 26–27.

Morris interviewed for the position at Caregiver in February 2019.  D. 120 ¶ 45; D. 133 ¶ 45.  Landry did not interview Morris for this position, but she was aware that Morris was a finalist and continued to communicate with Morris about the job, including about Morris's upcoming interviews scheduled with the company's CEO and CFO.  D. 114 ¶ 31; D. 131 ¶ 31; D. 120 ¶¶ 47–49; D. 133 ¶¶ 47–49.  When Morris replied that she did not see an interview scheduled with the CFO, Landry responded that she would "figure it out," and asked Morris, "[c]an you talk with [the] CFO now?"  D. 120 ¶ 50; D. 133 ¶ 50.  After the interviews, Landry spoke with Dau Tucker ("Tucker"), Caregiver's head of Human Resources, to "gather feedback."  D. 120 ¶ 52; D. 133 ¶ 52.  Landry later wrote to Tucker and Caregiver's CEO that Morris would meet with the "core [Indiana] group . . . to gauge fit," and stated that "as long as the team fits well, I am absolutely willing to put my chips into [Morris]."  D. 120 ¶¶ 55, 57; D. 133 ¶¶ 55, 57; D. 120 at 223.

On March 21, 2019, Landry sent an e-mail to Tucker copying Caregiver's CEO stating, "I'd like to proceed with an offer to Melanie Morris for State Director."  D. 120 ¶ 60; D. 133 ¶ 60.  On March 24, 2019, Tucker e-mailed Morris an offer letter for the State Director Position.  D. 120 ¶ 65; D. 133 ¶ 65.  The parties dispute the extent to which Landry and Morris communicated and coordinated after Morris received her formal offer from Caregiver, although it is undisputed that Landry served as a reference for Morris, messaged with Morris about giving notice to Seniorlink,

and, on April 1, 2019, let Riley know that Morris would leave Seniorlink to work for Caregiver. D. 120 ¶¶ 71–74; D. 133 ¶¶ 71–74; D. 114 ¶ 59–60; D. 131 ¶¶ 59–60.

On April 3, 2019, Seniorlink made a counteroffer to Morris, which Landry had told Morris to expect.  D. 120 ¶ 77; D. 133 ¶ 77.  Landry informed Tucker about the Seniorlink counteroffer. Id.  Landry also discussed the counteroffer with Morris, writing:

> It's all about your future, your career and building your resume. Here you will have your own state to lead, you'd learn strategic planning with me, and you'll learn more about [Government Relations]. Important for you to know that after we announced your decision internally last week the team was so excited to have you on board. I think it was Jim [] who said she is exactly what we are looking for.

D. 120 ¶ 78; D. 133 ¶ 78.  Landry later wrote:

> If you stay there, since managed care contracts take months, years, never to sign, high chance that your new position would be name only . . . remember Jen [ ]'s initial reaction of how proud she is that you had gotten the state director role and she was happy for you. Lastly, remember how excited you were to make the change with us.

D. 120 ¶ 81; D. 133 ¶ 81.  Morris asked Landry whether Caregiver could match the increased salary in Seniorlink's counteroffer, to which Caregiver agreed and Morris accepted.  D. 120 ¶¶ 83–84; D. 133 ¶¶ 83–84.  Landry then messaged Morris, "When they call you – and they will – say one sentence over and over and don't waiver [sic]. Something like 'my decision has been made.'"  D. 120 ¶ 85; D. 133 ¶ 85.

### C.    Landry's Stock Options

As of her August 2018 separation from Seniorlink, Landry had vested options to purchase 296,800 shares of Seniorlink's common stock.  D. 114 ¶ 16; D. 131 ¶ 16.  On March 14, 2019, Landry informed Seniorlink that she intended to exercise all her vested stock options, which she reiterated on March 17, 2019, and requested information about how to proceed with the exercise,

which Seniorlink provided the next day.  D. 114 ¶¶ 35–38; D. 131 ¶¶ 35–38.  On March 22, 2019, Landry wired funds to Seniorlink to exercise her vested stock options, in addition to signing the required documents.  D. 120 ¶ 64; D. 133 ¶ 64.  Seniorlink confirmed receipt of the money on March 26, 2019.  D. 120 ¶ 68; D. 133 ¶ 68.

At some point after March 26, 2019, Seniorlink updated its option exercise tracking system, Solium, to reflect Landry's attempted exercise of her options, and a Capitalization Table and Equity Structure retrieved from Solium on April 12, 2019 lists Landry with shares in the amount she indicated in her exercise.  D. 114 ¶¶ 51–53; D. 131 ¶¶ 51–53; D. 120 ¶ 91; D. 133 ¶ 91.  The Solium Capitalization Table reflects shares of the company that are either outstanding (i.e., when a certificate has been issued) or in process.  D. 114 ¶ 54–55; D. 131 ¶¶ 54–55.  In addition to the Capitalization Table, Seniorlink maintains a stock ledger, which is the company's official record of stockholders that have been issued stock certificates.  D. 114 ¶ 56; D. 131 ¶ 56.

On April 11, 2019, Riley informed Seniorlink's Board of Directors of his belief that Landry had solicited Morris in breach of her Non-Solicitation Agreement and the Board decided that the Compensation Committee should review the matter.  D. 120 ¶ 89; D. 133 ¶ 89.  On April 25, 2019, the Compensation Committee held a meeting where Riley made a presentation about Landry's alleged solicitation.  D. 114 ¶¶ 72, 77; D. 131 ¶¶ 72, 77.  After the presentation, the Compensation Committee determined that Landry had breached the Non-Solicitation Agreement and voted unanimously to terminate Landry's outstanding stock options.  Id.  Seniorlink returned the funds Landry had wired to exercise her vested stock options.  D. 114 ¶ 83; D. 131 ¶ 83.  On May 29, 2019, Seniorlink removed the transaction of Landry's option exercise from Solium, considering them expired.  D. 114 ¶ 88; D. 131 ¶ 88.

## IV.     Procedural History

Seniorlink filed its complaint against Landry on June 5, 2019.  D. 1.   Landry now has moved for summary judgment on her counterclaims and to dismiss two counts from her counterclaims.  D. 110; D. 112.  Seniorlink has moved for summary judgment on its claims and Landry's remaining counterclaims.  D. 115; 118.  The parties have also filed various motions to strike.  D. 121; D. 129; D. 151.  The Court has heard oral argument and took the matters under advisement.  D. 145.

## V.      Discussion

### A.      Landry's Motion to Dismiss

Landry asks the Court to dismiss Counts IV (breach of fiduciary duty claim) and V (tortious interference claim) of the counterclaim.  Seniorlink does not oppose the motion but seeks dismissal with prejudice.  D. 126.  Since Landry notes that those claims are "not support[ed]" by the facts revealed during discovery, D. 111 at 1–2, the Court concludes that dismissal with prejudice is appropriate.  Accordingly, the Court ALLOWS the motion, D. 111, and dismisses Counts IV and V of the counterclaim against Seniorlink with prejudice.

### B.      Landry's Motion to Strike

As indicated at the motion hearing, the Court DENIES Landry's motion to strike, D. 129, to the extent that she seeks to strike either or both of Seniorlink's motions for summary judgment, one as to its claims and one as to Landry's counterclaims.  D. 130 at 3–4; D. 149.  Given that such matter is committed to the discretion of the Court, see Zurich Am. Ins. Co. v. Watts Regulator Co., 860 F. Supp. 2d 78, 94 n.11 (D. Mass. 2012), the Court only notes that it is not unduly burdensome for the Court to consider the motion papers filed even if the Court would have allowed omnibus filings on either side if counsel had inquired in advance of any motion practice.

Second, the Court declines Landry's request that it strike over sixty statements (nearly half) from Seniorlink's statement of material facts ("SOF") since they are not sufficiently concise.  D. 130 at 7.  Although Local Rule 56.1 requires "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried," neither parties' SOF (or responses to same) is the model of conciseness.  For one example, the Court notes that Landry submitted an 80-page response to Seniorlink's Statement of Facts, D. 133, which includes significant legal argument and disputes factual statements even when Seniorlink directly quoted a contract, deposition or exhibit.  Given this state of affairs, the Court declines Landry's motion to strike in this regard and instead has focused on whether any facts are truly contested here.  See Fisher v. Town of Orange, 964 F. Supp. 2d 103, 106 n.1 (D. Mass. 2013) (finding that "[n]either party has precisely complied with [LR 56.1]," but that "[n]onetheless, the Court will attempt to determine, based on the parties' submissions, which facts are truly contested").

Third, Landry asks this Court to strike over twenty statements because they are based on inadmissible evidence and improper affidavits.  D. 130 at 9.  Since a movant "must specify the objectionable portions of the affidavit and the specific grounds for objection," the Court declines to strike any such statement where Landry fails to do so.  Facey v. Dickhaut, 91 F. Supp. 3d 12, 19–20 (D. Mass. 2014) (citation omitted).  To the extent that she does so, the Court addresses those arguments in the analysis below.

Landry challenges the affidavit of Mary Schafer ("Schafer"), asserting that Schafer lacked personal knowledge of the Compensation Committee's April 25, 2019 meeting and the materials committee members received beforehand because the meeting was conducted by telephone.  D. 130 at 9–10.  Given, however, that Schafer was present for the meeting and testified that she and the committee received the same materials beforehand and attached those materials to her affidavit,

D. 120 at 34, she has sufficient personal knowledge of the meeting and the documents that were received.  See Bay State Sav. Bank v. Baystate Fin. Servs., LLC, C.A., No. 03–40273–FDS, 2007 WL 6064455, at *9 (D. Mass. Mar. 23, 2007).  To the extent that Landry makes other unspecified or unsubstantiated challenges to Schafer's affidavit, the Court also declines to strike the affidavit (or portions of same) on those bases.

Landry also challenges the affidavit of Seniorlink counsel Benjamin Davis, offered to authenticate Landry's phone records received from AT&T in response to Landry's own subpoena for those records.  D. 130 at 10.  To the extent Landry seeks to strike the Davis affidavit for identifying the phone numbers in these records, the Court denies this portion of the motion as moot since the Court has not relied upon Davis's affidavit to identify the numbers.  Schafer, who has personal knowledge of the relevant phone numbers, submitted a supplemental affidavit identifying same.  D. 131-1 at 1–2.  The Court will rely upon Davis's affidavit only to authenticate that the phone records received in discovery, which AT&T provided to Landry and were then turned over to Seniorlink, are indeed those records.  D. 120 at 522, 559; see McMahon v. Digital Equip. Corp., 162 F.3d 28, 34 n.6 (1st Cir. 1998) (affirming district court's decision not to strike supplemental affidavits authenticating documents in response to motion to strike because affidavits cured initial failure to authenticate documents); Cremaldi v. Wells Fargo Bank, N.A., No. 13-cv-11767-MLW, 2017 WL 1190377, at *4 (D. Mass. Mar. 30, 2017) (denying motion to strike affidavit of attorney when used only to authenticate documents and not as to contents of documents); McIntyre v. United States, No. 01-cv-10408-RCL, 2006 WL 8458066, at *8 (D. Mass. May 18, 2006) (declining to strike attorney affidavits stating that documents are part of the record and describing same as "a well-established convention").

Landry next seeks to strike statements of fact supported with an affidavit from Morris about the contents of voicemails that have since been deleted from her personal phone, as well as statements of fact and testimony referring to the existence of Seniorlink's stock ledger. D. 129 at 1; D. 130 at 11, 13. As to the voicemails on Morris's phone, Morris testified that she intended to preserve them, had notified Seniorlink's counsel of their existence, but that the voicemails were accidentally deleted when she replaced her broken phone. D. 114-9 at 68. Given Morris's sworn recollection of the messages, an appropriate basis for her affidavit, the Court declines to strike these portions of the Morris affidavit. D. 120 at 425–26. The Court also declines to strike them as a sanction for alleged spoliation as the Court does not conclude that Landry has met that standard. The same is true as to statements of fact and testimony that reference the stock ledger, which Landry seeks to strike because the ledger was not produced to her. D. 130 at 2, 13. First, the statements of fact refer to the deposition testimony from witnesses with personal knowledge of the ledger. See, e.g., D. 114-10 at 26 (testifying about stock ledger after inspecting it prior to deposition). Second, though Landry asserts she has made "repeated requests" for Seniorlink to produce the ledger itself, D. 130 at 3, the document requests she cites do not specifically request the ledger; rather, they broadly seek documents showing total awarded and exercised stock options and "the total number of stocks presently owned, and issued by Seniorlink." D. 130-1 at 28–29, 34; D. 62-1 at 50, 61 (seeking "Seniorlink Equity Structure" but not ledger); D. 62-1 at 63 (proposing production of Equity Structure with investor/shareholder information redacted "except with respect to Landry, Riley, and members of the Compensation Committee"). Landry never specifically sought to compel the ledger, see D. 62, and Seniorlink asserts (which Landry does not appear to dispute) that once the ledger became a focus of her litigation strategy, Seniorlink offered her counsel several options to view or inspect the ledger to confirm its existence, which were not

accepted.  <u>See</u> D. 139 at 11–12; <u>see generally</u> D. 141.  Third, Landry relies upon testimony about the ledger to support her own factual submissions despite asserting that the testimony cannot be properly used as such, that she assumed the ledger did not exist, or that she was unaware of its existence during the litigation.  <u>Compare</u> D. 114 ¶¶ 56 (citing testimony about stock ledger in statement of facts to highlight differences between stock ledger and Equity Structure) <u>with</u> D. 141 at 10 (asserting that Landry "has prosecuted her counterclaims against Seniorlink based on the understanding that no stock ledger exists").  Accordingly, the Court declines to strike references to Morris' voicemails and to the stock ledger.

Lastly, the Court declines to draw an adverse inference or otherwise deny Seniorlink's summary judgment motion in its entirety because Morris's voicemails were deleted and handwritten notes from Compensation Committee members were allegedly destroyed.  D. 130 at 15.  "[A]n adverse inference based on spoliation 'usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, negligent destruction would not support the logical inference that the evidence was favorable to the defendant."  <u>E.E.O.C. v. Chipotle Mexican Grill</u>, 98 F. Supp. 3d 198, 209 (D. Mass. 2015) (quoting <u>United States v. Laurent</u>, 607 F.3d 895, 902 (1st Cir. 2010)); <u>see</u> <u>Citizens for Consume v. Abbott Labs.</u>, No. 1:01-cv-12257, 2007 WL 7293758, at *7 (D. Mass. Mar. 26, 2007).  Here, Landry has made no showing that the destruction of either piece of evidence was made in bad faith, much less willful or purposeful.  Morris testified that she attempted to preserve the voicemails, which were inadvertently lost when she exchanged a broken phone, and this evidence remains undisputed.  D. 114-9 at 68.  As to the notes, Landry has not shown the existence of notes by one committee member accused of destroying them, while the other was tasked with taking the official minutes at the meeting, which were produced to

Landry, and testified that after his handwritten minutes were turned into the official minutes adopted by the Board, the draft may have been destroyed.  D. 130-1 at 13, 18.

For all these reasons, the Court DENIES Landry's Motion to Strike, D. 129.

## C.      Seniorlink's Motions to Strike

Seniorlink moved to strike certain information from Landry's memorandum of law and exhibits in support of her motion to dismiss, and to find Landry in contempt of this Court's confidentiality order, which outlined a process for designating and producing information marked as confidential.  D. 122 at 6.  To the extent those exhibits contained a precise value of Seniorlink's common stock at the time Seniorlink was acquired, and thus not in the public domain, those figures appear to have been redacted and the Court denies as moot Seniorlink's request to strike the exhibit.  D. 123 at 4.  The Court also declines Seniorlink's request to strike a damages figure mentioned in Landry's memorandum of law.  D. 124-1 at 2.  Landry asserts that such a calculation was based upon publicly available information, non-confidential discovery and deposition testimony estimating Seniorlink's valuation at the time of the transaction, which she then used to approximate the value of her vested stock options.  See D. 123 at 4; D. 123-3 at 3; D. 123-5 at 7–10.  Seniorlink has not shown that such calculation was or could only have been done with the confidential financial information provided to Landry in discovery.

Seniorlink also moved to strike a paragraph from Landry's affidavit because they contend that it contradicts her prior deposition testimony.  D. 151; D. 152 at 5.  "When an interested witness has given clear answers to unambiguous questions, [she] cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  Colantuoni v. Alfred Galcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir.1994) (citations omitted).  Here, Landry testified in her deposition that she did not recall whether Seniorlink informed her that she had to sign the Non-Solicitation Agreement to

continue her employment there, see D. 152 at 2–3, and then later states in her affidavit that Seniorlink "never informed [her] that [her] continued employment was dependent upon" signing the Non-Solicitation Agreement.  See id. at 4.  Such a change is not a clear contradiction (i.e., from yes to no) as Landry testified that she does not recall one way or the other.  See Hofer v. Gap, Inc., 516 F. Supp. 2d 161, 169 (D. Mass. 2007) (citing Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002)) (noting that "affidavit should be stricken only if there is a clear and unambiguous contradiction between the affidavit and the prior sworn testimony" rather than affidavit that "merely explains, or amplifies upon, opaque testimony given in a previous deposition"); Waters v. J.C. Christensen & Assocs., Inc., No. 08-cv-11795-NG, 2011 WL 1344452, at *6 (D. Mass. Mar. 4, 2011), report and recommendation adopted, 2011 WL 1344544 (D. Mass. Mar. 22, 2011).

For these reasons, the Court DENIES Seniorlink's motions to strike, D. 121; D. 151.

**D.      Seniorlink's Claims**

*1.      Breach of the Non-Solicitation Agreement (Count I)*

Seniorlink moves for summary judgment on its claim that Landry breached the Non-Solicitation Agreement by taking part in the hiring of Morris.  Given the language of the non-solicitation clause that barred her from "directly or indirectly, either alone or in association with others, hir[ing], or approach[ing], solicit[ing], recruit[ing], induc[ing], enticing or attempt[ing to do so of] any of the other employees . . . of [Seniorlink], " D. 120 at 277, the undisputed record shows that Landry violated the Non-Solicitation Agreement.  This record shows that Landry, at least, induced and enticed Morris to leave Seniorlink for Caregiver in March and April 2019, then worked to induce and entice Morris to accept Caregiver's offer.  Once Morris applied for the position, Landry coordinated her interviews with company leadership and remained involved

internally in the interview process, even if she did not personally interview Morris. D. 114 ¶ 31; D. 131 ¶ 31; D. 120 ¶¶ 47–50; D. 133 ¶¶ 47–50. Landry indicated to the Indiana state team, which she supervised, that if they felt Morris was a good fit that she would support hiring her, and even kept in touch with the team to get Morris a written offer. D. 120 ¶¶ 49–52, 55, 57, 60; D. 133 ¶¶ 49–52, 55, 57, 60. Even after Morris informed Seniorlink of her decision to leave, Landry coached Morris on evaluating and declining Seniorlink's counteroffer. D. 120 ¶¶ 77–78, 81, 85; id. at 256; D. 133 ¶¶ 77–78, 81, 85. Landry was then personally involved with Caregiver's decision to match the increased salary in Seniorlink's counteroffer, which caused Morris to accept Caregiver's offer. D. 120 ¶¶ 83–84; Id. at 255, 528; D. 133 ¶¶ 83–84.

Landry's conduct influenced Morris's decision to leave Seniorlink for Caregiver. In her own words, Morris stated to Landry that she would "100%" work there if Caregiver could match Seniorlink's counteroffer. D. 120 at 255. Even in the most favorable light, Landry facilitated the offer match, which caused Morris to accept. Each of the actions is sufficient on its own to show Landry's inducement of Morris, as is the combination of them. See Advanced Micro Devices, Inc. v. Feldstein, No. 13-cv-40007-TSH, 2013 WL 10944934, at *11 (D. Mass. May 15, 2013) (ruling that a statement that a former employee wanted a current employee "to join her at [the new company] . . . is precisely the sort of inducement between colleagues to leave [the old company] that the [non-solicitation agreement] seek[s] to prevent" and noting that "[t]his statement went beyond merely providing [] career advice and constituted direct encouragement to leave [the old company]"); Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 238–39 (D. Mass. 2013), aff'd, 731 F.3d 6 (1st Cir. 2013) (citations omitted) (concluding that "solicitation includes 'deprecat[ing] [a] former employer or prais[ing] [a] new employer," does not require "first contact" by the

solicitor and that "encouragement" to come to the new company falls "within [the] definition of solicitation"), and certainly, the combination of these statements is sufficient.

Having found that Landry breached the Non-Solicitation Agreement, the Court turns to address her argument that the non-solicitation provision of that agreement is unenforceable.  D. 135 at 4.  Under Massachusetts law, such provision "is not invalid and may be enforced in equity provided it is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest."  Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1468–69 (1st Cir. 1992) (citation omitted).

Landry first asserts that the Non-Solicitation Agreement is unenforceable because it lacked consideration and is illusory as she argues Seniorlink was obligated to provide her a bonus under her employment agreement.  D. 135 at 9.  The Incentive Compensation Plan Landry signed, however, only provided that Seniorlink would consider Landry for a discretionary bonus, or rather that she would be eligible for Seniorlink's incentive compensation scheme, not that it must pay her one.  See D. 120 at 284.  Seniorlink paid her two bonuses in 2017, which she accepted.  Id. ¶¶ 11–13; D. 133 ¶¶ 11–13.  Landry agreed that acceptance of these bonus payments was "a reaffirmation of [her] obligations under any existing" Non-Solicitation Agreement.  D. 120 at 283.  Furthermore, Landry had to sign the Non-Solicitation Agreement for her continued employment with Seniorlink.  Id. at 274.[3]  Under Massachusetts law, "continued employment alone may suffice to support non-competition or other restrictive covenants."  Optos, Inc. v. Topcon Med. Sys., Inc., 777 F.Supp.2d 217, 231–32 (D. Mass. 2011) (collecting Massachusetts cases).   Landry's

[3] Landry's testimony that she does not recall or was never informed that her continued employment depended on her signing the Non-Solicitation Agreement, D. 134-4 at 39; D. 135-2 at 4, does not create a disputed factual issue here where, undisputedly the first page of the agreement, which she signed, states, "As a condition of . . . continuing such employment . . . the company has required that the Covered Person enter into this Agreement."  D. 120 at 274.

participation in the bonus plan, receipt of bonus payments, and continued employment at Seniorlink constitute sufficient consideration for the Non-Solicitation Agreement.  Landry additionally makes a variety of unavailing arguments about the clause's terms, particularly that key terms (i.e., induce, solicit, affiliate) are undefined or vague, and therefore should not be enforced.  D. 135 at 7–8.  "Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court."  Armstrong v. Rohm & Haas Co., Inc., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) (quoting Williston on Contracts § 4:18 (4th ed. 1990).  Landry's argument relies solely upon hypothetical factual scenarios but has offered no legal authority to suggest that these terms lack definition, are vague or overly broad.

Landry also argues that the clause is not enforceable because Seniorlink cannot show that it "serves any legitimate business interest," is unreasonable in scope and duration, and negatively impacts the public interest by restricting the free will of employees.  D. 135 at 12–14.  Employers, however, "clearly have a legitimate business interest in preserving the talent and goodwill of their employees," which includes keeping current employees and ensuring they are not influenced to leave by former employees.  Advanced Micro Devices, Inc., 2013 WL 10944934, at *11.  A one-year restriction that applies only, and specifically, to current employees and affiliates of Seniorlink is reasonable in scope.  See Corp. Techs., Inc., 943 F. Supp. at 244 (enforcing one-year non-solicitation agreement); Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 229–30 (1975) (holding three-year restriction reasonable); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 289–90 (1974) (holding non-compete lasting less than three years was not excessive or unreasonable).  Moreover, "the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties" SimpliVity Corp. v.

Bondranko, 204 F. Supp. 3d 340, 351 (D. Mass. 2016) (enforcing non-competition agreement) (citation omitted).

Accordingly, the Court allows Seniorlink's motion summary judgment as to Count I.

### 2.     Breach of the Separation Agreement (Count II)

Seniorlink also moves for summary judgment on its claim that Landry breached the Separation Agreement when she allegedly made negative comments about Seniorlink to Morris and Tucker in violation of the non-disparagement clause.   D. 116 at 20.

Seniorlink first cites Landry's communications with Morris, specifically the contents of the voicemails that were deleted from Morris's phone, in which Landry allegedly told Morris that Seniorlink and Riley acted unprofessionally and unethically surrounding her departure.   Id. Although Morris's testimony is corroborated (at least to date and time, by Landry's phone records) that the voicemails occurred, D. 120 at 425, the Court cannot for summary judgment purposes say that the contents, which are material to the breach claim, are undisputed and, therefore, does not rely upon them.

There is, however, other undisputed facts, that support Seniorlink's motion as to this claim. Landry e-mailed Tucker, Caregiver's HR Director, on April 20, 2019, in the context of this dispute that "Seniorlink is shady in my opinion, evidenced by questionable ethics on my departure . . . Given their shadiness, I am concerned that they believe they already have something else up their sleeve that they will serve up." D. 120 ¶ 101; D. 120 at 468.  Landry purports to dispute this fact (without sufficient explanation), D. 133 ¶ 101, despite the e-mail having been produced and quoted accurately by Seniorlink.  Landry otherwise offers no argument that these statements were not in breach of the Separation Agreement.

Landry agreed that she would not "say anything . . . which could reasonably be construed as critical or disparaging of Seniorlink," D. 120 at 81, but then e-mailed Tucker that she believed the company was "shady," and questioned the company's ethics in the context of her departure. Landry further implied that Seniorlink had nefarious or ulterior motives, writing "[g]iven their shadiness, I am concerned that they believe they already have something else up their sleeve that they will serve up." Id. at 468. This language in the emails is undisputed and offers a negative opinion of Seniorlink that calls into question the ethics, motives, and reputation of the company.

For the aforementioned reasons, the Court ALLOWS Seniorlink's motion for summary judgment on these claims, Counts I and II.

### E.    Landry's Counterclaims

*1.    Breach of the Stock Plan (Counterclaim Count III)*

Landry claims that Seniorlink breached its obligations to her under the Stock Plan when her options were rescinded following her breach of the Non-Solicitation Agreement. D. 113 at 6. Landry and Seniorlink cross-moved for summary judgment on this claim.[4]

The Stock Plan includes a "No Rights as Stockholder" provision. D. 120 at 72. That provision states: "[a]n Optionee shall have no rights as a stockholder with respect to any shares covered by an Option until the date of issuance of a stock certificate to him or her for the shares. No adjustment shall be made for dividends or other rights for which the record date is earlier than the date the stock certificate is issued . . . ." Id.

The Stock Plan also contains a "Forfeiture for Dishonesty or Termination for Cause" provision (the "Clawback Provision"), which states in relevant part that:

> [I]f the Compensation Committee determines, after full
> consideration of the facts, that . . . the Optionee (or holder of

---

[4] The parties agree that Delaware law governs the Stock Plan. D. 119 at 10.

> Restricted Stock) has violated the terms of any employment, noncompetition, nonsolicitation or proprietary information, confidentiality, nondisclosure or other agreement with the Company to which he is a party or by which he is bound . . . then the Optionee's right to exercise an Option shall terminate as of the date of such act, the Optionee shall forfeit all unexercised Options . . . and the Company shall have the right to repurchase all or any part of the shares of Common Stock acquired by the Optionee upon the earlier exercise of any Option . . . at a price equal to the amount paid to the Company upon such transfer or exercise.

Id. at 75.

Landry neither disputes that she signed the Stock Plan nor claims that it is invalid or ambiguous. Instead, Landry primarily argues that she was a registered stockholder of Seniorlink, and, therefore, the Clawback Provision of the Stock Plan does not apply to her at all, as she was no longer an "Optionee." D. 113 at 7. Landry, however, was not a stockholder of Seniorlink. The Stock Plan Landry signed multiple times states that upon exercise, an Optionee becomes a stockholder when a stock certificate is issued. D. 120 at 72. Landry was never issued a stock certificate because Seniorlink rescinded her attempted exercise before it could be processed. See D. 114 ¶ 88; D. 131 ¶ 88. Seniorlink confirmed that Landry never appeared in its stock ledger, the only official record of its certificated stockholder. D. 120 ¶ 115; D. 133 ¶ 115. Because Seniorlink relies upon its official ledger for certificated stocks, the fact that Landry's options exercise was entered into Solium, and thus appeared in Seniorlink's Capitalization Table, does not support her contention that she is a stockholder. See D. 114 ¶ 54–56; D. 131 ¶¶ 54–56. Nor does the fact that Seniorlink confirmed receipt of her options payment and paperwork. All that shows is Landry started the process to exercise her options. Similarly, Landry argues that because she is a stockholder, Seniorlink needed to redeem her stock, rather than send her a refund, and owed her notice to do so. D. 113 at 15. Again, Landry was not a stockholder, and Seniorlink followed the

procedures laid out in the Stock Plan's Clawback Provision to rescind options upon a breach of the Non-Solicitation Agreement, as both parties agreed to.  See D. 120 at 75.

Landry next argues that the Clawback Provision alone is not enforceable against her (but does not challenge the rest of the Stock Plan) because it was not registered with the Delaware Secretary of State.  D. 113 at 14.  Landry cites no authority for this proposition, despite reference to 8 Del. C. §§ 102 and 151, which deal with the distinct concepts of companies issuing whole classes of stock that impact certificates of incorporation, and corporate bylaws, not stock incentive agreements between employer and employee.

Finally, Landry argues that the Compensation Committee's determination did not meet the standard of review to which it was contractually bound, namely, a "full consideration of the facts." D. 113 at 18.  Landry cites no specific facts or authority that support her argument.  Members of the committee testified that at the Compensation Committee's special meeting they received materials and heard a presentation of facts from Riley.  D. 120 ¶¶ 110–12; D. 133 ¶¶ 110–12.  The Stock Plan vests the Compensation Committee with discretion to make such decisions and does not define "full consideration."  See D. 120 at 75; see also W.R. Berkley Corp. v. Hall, No. CIV.A. 03C-12-146WCC, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005) (holding that the compensation committee acted within its discretion to claw back stock options as defined by contract, which "clearly established the rights and obligations of each party relating to the conduct controlled by the agreement").

For all of these reasons, the Court grants summary judgment to Seniorlink on Count III of Landry's counterclaims.

      2.    *Breach of the Separation Agreement and Non-Solicitation Agreement (Counterclaim Counts I and II)*

Landry argues that Seniorlink breached both the Separation Agreement and the Non-Solicitation Agreement by nullifying Landry's options exercise extension, thereby "[taking] away a promise it made . . . to induce her to sign" the Separation Agreement.  She further asserts that Seniorlink's "unilateral change" of the exercise date had no "factual, legal, or moral basis," causing Landry to suffer damages.  Landry also contends that Seniorlink violated the covenant of good faith implicit in all contracts for these same reasons, and because Seniorlink treated Landry differently than others it had similar contracts with.  D. 134 at 21–22.  These are basic claims of contract formation, not claims of a material breach of either contract's terms.

As this Court has already addressed in its denial of Landry's first motion to amend, "Landry executed the Separation Agreement releasing and discharging Seniorlink from all claims and liabilities," D. 31 at 4–5, including breach of contract, "breach of the implied covenant of good faith and fair dealing and any other claims, demands, causes of action and liabilities of any kind whatsoever relating to or with respect to any event, matter, claim, occurrence, or injury arising out of or in any way associated with" her employment or separation from Seniorlink.  D. 120 at 80.  For the same reasons stated in that Order, Landry's contract claims brought under the Separation Agreement were waived when she signed that agreement.  See D. 31.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Landry's motion to dismiss with prejudice, D. 110, DENIES Landry's motion to strike, D. 129, DENIES Seniorlink's Motions to Strike, D. 121; D. 151, DENIES Landry's motion for summary judgment, D. 112, and ALLOWS Seniorlink's motions for summary judgment, D. 115; D. 118.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge